UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDREW GROSJEAN AND GLENDA
GROSJEAN,

   PLAINTIFFS,

              CASE NO. 05-74338

V.

              HONORABLE ARTHUR J. TARNOW
SHARON BOMMARITO *ET AL.*,     UNITED STATES DISTRICT JUDGE

   DEFENDANTS.
              /

<u>ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [D/E # 33], AND
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [D/E # 32]</u>

**I. INTRODUCTION**

On June 19, 2007, the parties conducted oral argument on their cross motions for summary judgment. This Court orally ruled from the bench **GRANTING** Defendants' Motion for Summary and **DENYING** Plaintiffs' Motion for Summary Judgment. The Court also asked the parties to further brief the issue of damages. This order now reflects and elucidates the ruling made at the June 19, 2007 hearing.

**II. BACKGROUND**

The State of Michigan Department of Labor & Economic Growth's Unemployment Insurance Agency ("UIA") runs an Advocacy Program to provide no-cost information, consultation, and representation in administrative hearings to unemployed claimants and employers who qualify and request such services. Independent advocates contract with the UIA on a one-year basis subject to renewal based on the discretion of the Program Administrator. The advocates sign a "Personal Service Contract" ("Contract") in which they agree to submit biographical information, attend an orientation, complete periodic education, and register as vendor/contractors for MI. These bios are submitted on an "Advocate Profile Information Form" ("API") and is meant to be limited to "relevant personal information," which is defined as "education, experience, or any special qualifications, the advocate's business hours and days of

availability, and geographic areas of availability for consultation and representation services."
Section IV B of the Contract states:

> API forms may be edited by Program Staff. Acceptance of the Personal Service Contract includes acceptance of Section IV B which permits the Agency to edit an API statement.

Employees and Employers who contact the UIA for services are sent a cover letter, brochure, and list of the APIs for advocates in their geographic area. The unemployed workers/employers then may choose to contact any advocate from the list. Those who use the advocates' services are informed verbally and in writing that the advocates are independent contractors, and not employees of the state.

Plaintiffs Andrew and Glenda Grosjean are advocates for the UIA. Defendants Bommarito, Michalski and Twyman are employees of the UIA. Prior to this suit, Plaintiffs included Biblical passages in their API profiles (Andrew since 2001, Glenda since 2003). Mr. Grosjean's API profile read in part:

> I know the rules and will give you 100%. Call me for undivided attention. Last minute cases welcome. 'Thus saith the Lord, Keep ye judgment and do justice, for my salvation is near to come.' Isa. 56.5"

Mrs. Grosjean's API profile read:

> Courteous and qualified, I will not treat you like a number. An EXPERT in unemployment law, I will aggressively conquer your case. 'And what doth the LORD require of thee but to do justly and love mercy and walk humbly with they GOD.' Micah 6:8b.

During this time, it is undisputed that the Grosjeans were hired by customers on account of these Biblical passages.

On or about September 15, 2005, Plaintiffs attempted to renew their Contracts with the UIA. Defendant informed Plaintiffs that the biblical verses had to be removed from their APIs. UIA officials made the decision to censor the speech in the Grosjeans' APIs after an UIA employee questioned whether the biblical passages were relevant. UIA officials agreed that the biblical passages were not relevant.

In November, 2006, the Plaintiffs submitted APIs for distribution that contained biblical references but without the actual text. Andrew Grosjean's API included the language:

"Experienced in MESC appeals and church employment issues from a Biblical perspective (see Isa. 51:1)." Glenda Grosjean's API included the language: "Two years experience counseling claimants on standing up for their rights from a Biblical perspective (see Micha 6:8)."  The UIA censored the phrase "from a Biblical perspective (see Isa. 51:1)" from Andrew's API and censored the phrase "counseling claimants on standing up for their rights from a Biblical perspective (see Micah 6:8)" from Glenda's API.

Plaintiffs brought suit in federal district court alleging that Defendants' censorship actions violated  Plaintiffs' rights to free speech, equal protection, free exercise, and violated the establishment clause.  Plaintiffs sought a declaratory relief, preliminary and injunctive relief, damages and costs and fees.

### III. PRIVATE V. GOVERNMENT SPEECH

The Supreme court has held that an interest in complying with the Establishment Clause

> may be characterized as a compelling interest and therefore may justify a content-based distinction.  However it is not clear whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination.

*Good News Club v. Millford Cen. Sch.*, 533 U.S. 98, 112-13 (2001) (quotation omitted).

Defendants contend that Plaintiffs' speech contained in their APIs should be considered either government speech or at the very least private speech that promotes a government message.  Based on the category of speech, Defendants' argue that they would be allowed to censor Plaintiffs' APIs because the religious text may have implicated the Establishment Clause of the United States Constitution.  Defendants argue that the customers who received the API list might have believed that the Agency promoted one religion over another in violation of the Establishment in violation of *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  Plaintiffs disagree and contend that their speech is purely private speech.

The policy of the UIA Advocacy Program is to hire advocates as independent contractors who then represent unemployed workers/employers.  The advocates are private employees and not employees of the state.  This fact is also expressly stated to the customers.  Additionally, the APIs are both created by advocates in their own unique style to describe, distinguish and promote themselves to possible clients.  The circumstances surrounding the speech including the disclaimer could not cause customers to reasonably believe that the API List is government

speech or that it is clothed with the *indicia* of the state. Instead, the speech is more properly categorized as private speech and as a result there are no Establishment Clause concerns. Since the speech is purely private, there can be no compelling interest of "possibly violating the Establishment Clause" because no one would confuse the speech in the APIs to be government promoting a certain religion.

B.     FORUM ANALYSIS

The more difficult question is what type of forum was created by the API list. The type of forum will determine the scope of regulations that the UIA would be able to enforce.

> [C]onsideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved.

*Heffron, Sec'y and M'gr of The MN State Agric Soc Bd of Mg'rs v. Int'l Soc for Krishna Consciousness*, 452 U.S. 640, 650-1 (1981)(citations omitted). The Sixth Circuit has outlined the different classes of forums and the type of scrutiny that is required to analyze speech limiting actions within each forum.

> A traditional public forum is a place "which by long tradition or by government fiat has been devoted to assembly and debate," such as a street or park. *See id.* at 45. In traditional public fora, "the rights of the state to limit expressive activity are sharply circumscribed": the government may enforce content-based restrictions only if they are narrowly drawn to serve a compelling interest, and may enforce content-neutral time, place, and manner regulations only if they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." Id.
>
> The second type of forum has been alternatively described as a "limited public forum," *see Rosenberger*, 515 U.S. at 829, and as a "designated public forum," *see Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679, 140 L. Ed. 2d 875, 118 S. Ct. 1633 (1998). The government may open a limited public forum "for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius*, 473 U.S. at 802. Although the government need not retain the open nature of a limited public forum, "as long as it does so it is bound by the same standards as apply in a traditional public forum." *Perry*, 460 U.S. at 46.
>
> The third and final type of forum is a nonpublic forum. The government may control access to a nonpublic forum "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by

the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806; *see also Perry*, 460 U.S. at 46.

*Kincaid v. Gibson*, 236 F.3d 342, 348 (6th Cir. 2001). The government can restrict access to a nonpublic forum as "long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." *Arkansas Educ TV Comm v. Forbes*, 523 U.S. 666, 677-88 (1998).

Plaintiffs contend that the API list is a designated public forum because the government makes the mode of expression "generally available to a class of speakers." *United Food & Comm. Workers Unions v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341, 350 (6th Cir. 1998). Plaintiffs argue that although an express policy may have been in place, the UIA's failure to exercise editorial control of the APIs shows that the forum was in effect a type of public forum. The Sixth Circuit has noted "actual practice speaks louder than words in determining whether the government intended to create a limited public forum." *Kincaid*, 236 F.3d at 351. Defendants disagree arguing that the API list is a "nonpublic forum" because it is traditionally neither open to public debate nor designated a free and open public forum.

Whether a forum is a designated forum or a nonpublic forum hinges on whether access to the forum is general or selective. *Arkansas Educ. TV Comm*, 523 U.S. at 679.

> To determine whether the government intended to create a limited public forum, [courts] look to the government's policy and practice with respect to the forum, as well as to the nature of the property at issue and its compatibility with expressive activity.... Further the context within which the forum is found is relevant to determining whether the government has created a limited public forum.

*Kincaid*, 236 F.3d at 349 (internal citations omitted). The Supreme Court has recognized that the "necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for... the discussion of certain topics." *Rosenberger v. Rector & Visitors*, 515 U.S. 819 (1995).

In *Kincaid*, the Sixth Circuit found that a school's yearbook was a limited public forum because of the school's policy and practice, the essential nature of the yearbook and its compatibility with expressive activity. 236 F.3d 342. In *Lehman v. City of Shaker Heights*, the

Supreme Court determined that because the city intended to limit access to the advertising spaces on city transit buses, it need not accept every proffer of advertising, and that it had the discretion to make reasonable choices concerning the type of advertising that may be displayed in its vehicles. 418 U.S. 298, 303-304 (1974). *Rosenberger* involved denial of eligibility for payments from a university's Student Activities Fund to student publications based on religious viewpoints. 515 U.S. 819. The activities fund was determined to be a limited public forum that extended benefits to a variety of student publications whose ideologies and viewpoints were broad and diverse. *Id*.

Based on this analysis, the forum was a non-public forum based on the nature, context, stated policy and practice of the forum and therefore subject to all reasonable regulations. The forum here was available only to a limited segment of the population (qualified advocates) who sought authorization and met certain requirements were then permitted to submit an API. Once admitted to the forum, the advocates were to expressly required conform to forum's rules: reeducation, testing, and submission of relevant biographical information. The forum was never open to public debate, let alone private debate since the speech in the forum was limited to the program's goals and the parameters of their contract. Although, Plaintiffs point to other seemingly non-relevant information contained in other advocates APIs that were not at the time censored, Plaintiffs have failed to demonstrate that the Defendants' negligence in failing to edit amounted to creating a type of public forum. The forum's subject matter consisted merely of personal advertisements that for the most part conformed to guidelines, and as a result the need to edit for relevancy was not that high.

The situation in this case is unlike *Kincaid* where the Sixth Circuit determined that even though the school's policy limits the class involved in the forum (those appointed to yearbook), that once admitted the editorial control was then given to the class. In contrast, the UIA's explicit policy maintained editorial content. The UIA also limited the nature of the discussion in the forum to "personal relevant information," which was later defined in the agency's policies. Thus, the forum was ostensibly controlled by the government based on the speaker's identity and subject matter, *i.e.* qualified advocates and relevant to qualifications with regards to the

Agency's goal respectively.

The nature of the property and the forum's incompatibility with expressive activity also supports Defendants' argument that the API list is a nonpublic forum. The API listings are unlike a creative publication such as a yearbook because the nature of the property is to provide a particular service and information to the unemployed. In order for an unemployed person to make an informed decision in selecting an advocate that best suit her needs, she must examine the advocates bios which are meant to inform the customer about an advocates qualifications, strengths and other pertinent information. In terms of context, this is not a university or school setting as in *Kincaid* and *Rosenberger* where the free flow of ideas is a special concern. Again, this is a job posting site where the qualifications of an advocate are of importance to the unemployed customer so that the she may make an informed decision.

Under a non-public forum analysis, the UIA's regulation that limited the forums' content to relevant personal qualifications was reasonable considering the purposes of the forum and the objectives of the UIA. The goal of the APIs list is to allow customers to find qualified advocates who best suit their needs. Thus, the information contained in the API is meant to relate to their qualifications and free standing Bible passages could be restricted because they are irrelevant to the person's qualifications.

C.  **VIEWPOINT DISCRIMINATION**

There is a distinction between content discrimination which may be permissible if it preserves the limited forum's purposes, and on the other hand, viewpoint discrimination, *i.e.* discrimination because of the speaker's specific motivating ideology, opinion or perspective, which is presumed impermissible when directed against speech otherwise within the forum's limitations. An act of censorship based on viewpoint is presumptively invalid under the First and Fourteenth Amendments. *Rosenberger*, 515 U.S. at 828 ("Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rational for the restriction...").

Plaintiffs argue that Defendants engaged in viewpoint discrimination based on animus

against Plaintiffs' religiosity.  Plaintiffs contend that Defendants' stated excuse for removing the religious speech, *i.e.* because the material was irrelevant, lacks credibility because the religious text was related to justice in the same way that others' APIs discussed justice, but was only their APIs were edited.  Examples of APIs that were not censored include:

1. I LOVE A GOOD FIGHT!! When the going gets tough call Kokko! I'm an attorney experienced in getting people what they deserve.  I'll stand by you, even when no one else will.  You need a WINNER when the chips are down... LET'S GET IT ON!!

2. I am a believer, and what I believe is that you deserve your benefits.

3. AREN'T YOU TIRED OF BEING TREATED UNFAIRLY!! I BELIEVE IN JUSTICE.  I WILL FIGHT FOR ALL YOUR RIGHTS AND BENEFITS...

4. HONEST AND AGGRESSIVE REPRESENTATION are what you need to secure all the BENEFIT YOU DESERVE.

5. SCREWED OVER BY YOUR EMPLOYER? DON'T SETTLE FOR AN AMBULANCE CHASER.

Plaintiffs argument is that the UIA's failure to edit these statements is indirect evidence that UIA engaged in viewpoint discrimination.  These unedited statements only conceivable relevance to an advocate's qualifications is that they relate to the advocates' theory of justice.  However, when Plaintiffs attempted to address the same issue of justice by quoting Bible verses, they were censored.  Plaintiffs conclude that the only way to understand how their profiles were edited and others were not is because of their religious perspective.

Plaintiffs' argument is unpersuasive.  Plaintiffs' lack any direct evidence that Defendants' censored their APIs based on viewpoint discrimination and their indirect evidence is insufficient to support a finding of viewpoint discrimination.  Defendant stated reason for censoring the profiles the Bible verses was that the verses lacked relevance to an advocates' qualifications for representation.  This editorial decision was vested in UIA's management and based on the UIA's guidelines.  Although the question of relevance may in some situations be hard to define, definitions and examples were given in the Contract.  These boundaries were necessary to define the limits and purpose of the program.  The fact that Defendants negligently

failed to enforce this "relevance" provision for a number of years did not create an estoppel argument, since Plaintiffs themselves were allowed to benefit from the UIA's lax enforcement. Additionally, since the original censorship, Defendants have not edited all of the religious speech from Plaintiffs' APIs, only the religious passages that the management considers irrelevant. For example, Plaintiff's education at a Bible college and work history as a pastor at a Christian church have not been edited because they are relevant to the his qualifications. Based on these reasons, this Court finds that there are no genuine issues of material facts relating to whether Defendants engaged in impermissible viewpoint discrimination.

### D. EQUAL PROTECTION

Plaintiffs also argue that their rights to equal protection were violated by the censorship. "Under the Equal Protection Clause.... government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored more controversial view." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). Plaintiffs argue that similarly situated advocates were allowed to write APIs with a wide variety of messages and viewpoints, whereas as Plaintiffs have been treated differently based on their religiosity.

Similar to their viewpoint discrimination argument, Plaintiffs have failed to present a case of a Fourteenth Amendment Equal Protection violation. Plaintiffs lack direct evidence that Defendants purposefully discriminated against them and have failed to present enough indirect evidence to justify a ruling that they were impermissibly discriminated against based on their religion. In effect, Plaintiffs have not presented enough evidence to allow a finding that their was either viewpoint discrimination or an Equal Protection violation. As a result, both claims are dismissed in favor of Defendants.

### E. VAGUE AND OVERBROAD

Plaintiffs' also argue that the UIA's policy listed in the Contract is facially unconstitutional because the restriction is both vague and overly broad. According to Plaintiffs, the UIA's policy and practice restrict more speech than is necessary to maintain the purpose of the forum and is therefore overbroad.

> Under the First Amendment overbreadth doctrine, an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face because it also threatens others not before the court- those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid

*Board of Airport Comm'rs of Los Angeles v. Jews for Jesus*, 482 U.S. 569, 574 (1987).

Plaintiffs' claim that the UIA's restriction fails to offer guidance or limits in terms of enforcement and instead places unfettered, editorial discretion with Defendants. In *United Food*, the Sixth Circuit struck down a requirement that wrap-around bus ads be "aesthetically pleasing" and not "controversial." 163 F.3d 341 (6th Cir. 1998). Similar to the Plaintiffs in *United Food*, Plaintiffs argue that Defendants' prohibition on religious speech in APIs is overbroad since it could "conceivably lead... [government] officials to reject a proposed advertisement because of the viewpoint expressed, a power they do not have under the First Amendment." *Id*. at 361.

In terms of vagueness, a "law must provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Under *United Food*, the Sixth Circuit determined that the editorial policy was vague due to prohibiting "controversial" ad and requiring that the ads be "aesthetically pleasing" without any parameters. As a result, a due process problem arose because "a person of ordinary intelligence [could not] readily identify the applicable standard for inclusion and exclusion." 163 F.3d at 358-39. In this case, Plaintiffs argue that UIA Program provides neither guidance nor limitation on the unfettered discretion of Defendants to define "relevant personal information." Because of this alleged lack of clear standards, Defendants' policy "invites abuse by enabling the official to administer the policy on the basis of impermissible factors." *Id*. at 359.

Both of Plaintiffs' arguments fail. The standard for determining whether a statute is vague is whether a person of ordinary intelligence could identify the applicable standard for inclusion and exclusion. Had the restriction merely said "relevant personal qualifications" then perhaps there would be a colorable argument that the restriction is vague. But immediately following the phrase, the Contract articulates what the personal qualifications would entail. Moreover, the Agency's objectives as a whole gives further depth to these terms. The Contract

provides both guidelines and limitations to the terms "relevant personal information." The guidance comes in the form of a list of relevant topics: education, experience, special qualifications, business hours and days of operation, and geographic availability. The limitation comes from the fact that the information must be relevant and personal, which is specific in terms of the purpose and context of the program. In this case, the Bible passages themselves fail to qualify as the Grosjeans' education, experience or qualifications. In *United Food,* the terms "aesthetically pleasing" were viewed in a broader context of bus advertising, since the bus company had no purposes or objectives and no suggested topics for advertising. Unlike *United Food*, the limiting terms involved here are meant for a broader purpose and objective, to provide customers with an qualified advocate best suited for their needs. Moreover, the terms is not vague here since the meaning can be extrapolated from the profile objectives as a whole. *Grayned*, 408 U.S. at 110. Thus, a person of ordinary intelligence could identify the applicable standard for inclusion and exclusion of this restriction.

As for the overbroad contention, the restrictions as limited by the guidelines and would not chill the free speech of those not before the Court. Additionally, Defendants' discretion is not unfettered. The breadth of Defendants' discretion is dictated by the requirement of relevancy, the suggested types of information deemed to be relevant, and the narrow function of the APIs.

**F.    MOOTNESS**

Defendants argue that the claims should be dismissed as moot because the UIA has developed a template format to replace the narrative-style biographical profile format. A defendant's voluntary cessation of the challenged practice does not deprive a federal court of its power to determine whether the practice was unconstitutional, but it also may moot a case if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. Here, Defendants contend the it has remedied any alleged constitutional violation by voluntarily abandoning the biographical profile format used by the Agency when Plaintiffs filed their lawsuit. The new objective format does not lend itself to inclusion of narrative information not relevant to the program.

This Court disagrees and finds that the case is not moot. Although now the form may not lend itself to personal narratives, advocates may still include "whatever they think is relevant" on the template to be placed in their APIs. In fact, the Grosjeans recently submitted API information on the new form and Defendants censored the Bible references, even though they only included the chapter and verse, with no biblical quote. Defendants have not changed their policy of prohibiting certain religious views in the APIs and there is nothing to prevent them from going back to the old template, there is a history of not enforcing the guidelines except for religious discrimination.

**G.    DAMAGES**

In September 2006, this Court granted qualified immunity to Defendants. This Court does not see any reason to revisit the issue based on the evidence presented at oral argument and in the briefs. Because Defendants did not violate any of Plaintiffs constitutional rights, there is no justification to award damages.

**H.    CONCLUSION**

For the reasons stated above and at oral argument,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment be **GRANTED**, Plaintiffs' Motion for Summary Judgment be **DENIED** and the case be **DISMISSED WITH PREJUDICE**.


S/ARTHUR J. TARNOW
Arthur J. Tarnow
United States District Judge

Dated:  August 2, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 2, 2007, by electronic and/or ordinary mail.

S/THERESA E. TAYLOR
Case Manager